**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **KRIS WORKMAN**<br>**Plaintiff,** | §<br>§<br>§ | |
| **v.** | §<br>§<br>§ | **CIVIL ACTION NO** |
| **THE UNITED STATES OF AMERICA**<br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§ | **19-cv-00506** |

**PLAINTIFF KRIS WORKMAN'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

This case arises out of negligence and negligence *per se* by the United States of America and its agencies causing the significant and permanent injuries at Sutherland Springs First Baptist Church on November 5, 2017. Kris Workman, Individually, (hereinafter referred to as "Plaintiff"), brings this Complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674 against the United States of America and would respectfully show the following:

**Contents**

I.    PARTIES………………………………………………………....3

II.   BACKGROUND………………………………………………....3

    A.  Congress passed key legislation to prevent shootings like the Sutherland Springs shooting………...5

    B.  Federal Law creates a mandatory, non-delegable duty for the Air Force to report a conviction for domestic violence, incarceration for a crime punishable by more than one year, and mental institution commitment………………………….…7

    C.  The Department of Defense and Department of the Air Force have a history of failing to submit reportable incidents to the FBI's National Instant-Background System database………………………………………………….…10

III.  DEVIN KELLEY

A. The Air Force knows Devin Kelley's violent history……………………...11

B. The Air Force commits Devin Kelley to a mental health facility…………...13

C. The Air Force convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year……..………....14

D. The Air Force failed to report Devin Kelley's domestic violence conviction, his incarceration for a crime punishable by more than one year, and his commitment to psychiatric inpatient care……………………………………………………16

E. The Air Force failed to submit Devin Kelley's fingerprint data and conviction to the FBI's criminal background check database…………………………...…...17

IV.   CAUSES OF ACTION.

A. The Department of the Air Force was negligent………………….…………18

B. The Department of Defense was negligent…………….….………………20

C. Under Texas law, the United States is directly liable to the Plaintiffs through its Vice-Principals ……………………………………………………………….…...21

V.   CAUSATION

A. Department of Defense and Department of the Air Force's negligence cause injuries and damages to Plaintiff Kris Workman………………………….………31

B. Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase…...……32

VI.   DAMAGES……………………………………………………….…………30

VII.   JURISDICTION, VENUE, & SERVICE……………….……….……..……..34

VIII.   LIABILITY OF THE UNITED STATES…………………….……….…35

IX.   JURISDICTIONAL ALLEGATION……………………….……….…..37

## I.   <u>PARTIES</u>

1.1   Defendant is the United States of America.

1.2   Plaintiff is a resident of Texas.

1.3   Plaintiff received direct physical and emotional injuries from over eight gunshot wounds in the shooting at the First Baptist Church of Sutherland Springs on November 5, 2017.  He is therefore a proper party to bring suit under Texas law for personal injuries suffered as a result of the negligence of the United States of America, the United States Air Force and the

Department of Defense that proximately caused his permanent injuries.

## II.  <u>BACKGROUND</u>

2.1     Through several pieces of legislation spanning almost thirty years, Congress acted to block individuals who present a known risk of violence from purchasing firearms. To that end, Congress mandated that certain individuals must be flagged in an instant criminal background check system used by firearms sellers nationwide in the interest of public safety. The Air Force and Department of Defense ignored three statutory mandates that required Devin Kelley's entry into the background check system: his domestic violence conviction, his conviction for a crime punishable by imprisonment for over a year, and his commitment to a mental institution. As a direct result of the Air Force and Department of Defense's failure to flag Kelley in the FBI (Federal Bureau of Investigations) database, his documented threats of gun violence while in the Air Force combined with his active efforts to acquire guns and body armor while in the Air Force predictably resulted in a shooting rampage after his release from the Air Force.

2.2     The Air Force provided no notice whatsoever to the civilian population of the threat posed by this shooter when it illegally allowed the mentally ill shooter while under its control to retain the legal capacity to purchase firearms and to continue to retain that capacity upon discharge from the Air Force. The failure to act by the Air Force to comply with the law in the use of ordinary care, despite the accumulated knowledge by mental health professionals employed by and under contract with the Air Force about the shooter's dangerous mental condition made the shooter's later acts of mass murder simply a question of time, location and the identity of his victims.   The shooter predictably attempted to enter into domestic relationships subsequent to his discharge.   His mental illness known to the Air Force long before his discharge in early 2014 combined with his propensity for threats of gun violence and known prior attempts to acquire the means to perpetrate them resulted in a predictable armed

attack, targeting his ex-wife's family, congregation members, and neighbors at the Sutherland Springs First Baptist Church on November 5, 2017.

2.3    Kris Workman was in the church that day as the praise team leader and had just returned to a pew before the attack started from outside the church. Kris Workman, his brother Kyle and his mother Julie all fell to the floor in the church when the shooting started and attempted to play dead. Kris watched as others around him were shot. The shooter eventually approached Kris from behind, placed the barrel of the rifle against his back and fired a paralyzing shot directly into his spine.  He then drew his sidearm before leaving the church and fired another round into Kris' intestines, rupturing them.  Kris required surgery to close the abdominal wounds and lay hospitalized for weeks while doctors attempt to assess, evaluate and treat his spinal injuries. He began a long rehabilitation program on an in-patient basis and eventually transitioned to an outpatient. He has required ongoing medication for severe nerve pain, repeated treatment for UTI infections related to catheterization and other treatments and procedures, including psychological evaluation. He has lost almost all sensation below the waist and now requires use of a wheelchair to move from place to place.   He continues to suffer from the permanent and ongoing physical and emotional effects of his injuries and their effects and will do so for the rest of his life because his paraplegia and associated complications are permanent.  His ability to father children is in doubt, his interaction with his one child is impaired, as is his interaction and relationship with his wife due to his permanent injuries and loss of sensation below the waist.

2.4    Congress passed key legislation to prevent shootings like the Sutherland Springs shooting.Federal law makes it unlawful to sell a firearm to a person whom the seller knows or has reasonable cause to believe is someone who (a) has been convicted of a misdemeanor crime of domestic violence; (b) has been convicted of a crime punishable by imprisonment for longer than a year; or (c) has been committed to any mental institution.  18 U.S.C§922(d)(l),(4),(9). These categories of individuals are forbidden from possessing firearms. *Id.*§922(g).

2.5    Congress attempted to quell the dangers presented by mass shooters like Devin Kelley before he was even born. Initially passed as the Gun Control Act of 1968, the law

banned the sale of firearms to those individuals with criminal histories and those individuals who have been committed to mental institutions.

In 1993, Section 103 of the Brady Handgun Violence Prevention Act required the Attorney General of the United States to establish an instant criminal background check system that a firearm seller must use to determine whether the sale of the firearm violates 18 U.S.C. § 922. Under 18 U.S.C. § 922(t), a licensed dealer of firearms shall not sell or transfer to any person without first contacting the national instant criminal background check system.

2.6    Congress passed the Brady Bill to prevent shootings just like the Sutherland Springs shooting. When the Brady Bill was introduced in the House, one of the Bill's sponsors explained that express purpose:

> Mr. Speaker, I rise to strongly support today's introduction of the Brady Bill. Five years ago, a man named Larry Dale walked into Mercer's Discount Foods in Tulsa, OK, and opened fire on an unsuspecting crowd of shoppers. Dale's rampage killed one person and severely wounded another. Many Oklahomans were outraged to learn that Dale, a convicted felon with a history of mental illness, had walked into a gun store the day before his crime, filled out a single form, and walked out with his instrument of death. The tragedy is that 5 years after Larry Dale proved how flawed the system is, the Brady Bill is not the law of the land.[1]

2.7    When the Brady Bill went to committee, the Chairman's opening statement in the House Subcommittee hearings noted that the Brady Bill would effectively prevent barred individuals from purchasing firearms: We are meeting today to consider a bill whose time has come- the Brady Handgun Violence Prevention Act....

There is nothing complicated about this bill. … It will save lives. The Brady Bill will save lives that are being wasted in an epidemic of handgun violence from Brooklyn to Florida and all across America. And that is not theory that is fact.

After Brady passes, a convicted felon will no longer be able to walk into a gun store, as thousands have done this year, and walk out 10 minutes later with a murder weapon. State after

State has shown that waiting periods and background checks work.

2.8     The committee issued the House Committee Report. Under the heading "Summary and Purpose," the committee reported:

The purpose of H.R. 1025 is to prevent convicted felons and other persons who are barred by law from purchasing guns from licensed gun dealers, manufacturers or importers.

2.9     The House report underscored that background checks are necessary to prevent violent offenders from gaining access to firearms:

> The experiences of States which require background checks before firearm sales also indicate that many repeat offender criminals buy guns directly from firearms dealers. For example, in California, a background check intercepted 2,500 felons attempting to buy guns from dealers last year...

Each year in Illinois some 3,000 prohibited persons seek to purchase firearms and are denied.[3]

2.10    In 1996, the Domestic Violence Offender Gun Ban, also referred to as the "Lautenberg Amendment," made it unlawful to sell firearms to anyone convicted of a misdemeanor crime of domestic violence. Congress enacted the Domestic Violence Offender Gun Ban to "close [a] dangerous loophole" in the gun control laws: while felons had long been barred from possessing guns, many perpetrators of domestic violence are convicted only of misdemeanors.

2.11    In abusive relationships, the severity of domestic violence often increases over time, and the presence of a firearm increases the likelihood of homicide.[5] Congress recognized that "[f]irearms and domestic strife are a potentially deadly combination." As one Senator noted during the debate over § 922(g)(9), "[A]ll too often, the only difference between a battered woman and a dead woman is the presence of a gun." 142 Cong. Rec. 22986 (1996) (statement of Sen.Wellstone).

**A.**    **Federal Law creates a mandatory, non-delegable duty for the Air Force to report a Conviction for domestic violence. Incarceration for a crime punishable by more than one year, and mental institution commitment.**

2.12    Federal law requires and mandates Government agencies to report ineligible firearm purchasers to a national database. Specifically, 34 U.S.C. § 4090l(e)(l)(C) states that federal agencies that have "any record of any person demonstrating" that the person should not be able to purchase a gun "shall, not less frequently than quarterly, provide the pertinent information contained in such record to" the Attorney General for the national instant criminal background check system. Section 4090l (e) (l) (D) creates an obligation on agencies to correct and update these records.

2.13    Title 10, U.S.C. section 1562 requires that the Department of Defense establish a central database of information on the incidents of domestic violence involving members of the armed forces. This section also requires that all military departments, including the Department of the Air Force, report domestic violence incidents. It is Department of Defense policy that all Department agencies, including the Department of the Air Force, comply with the (a) crime reporting requirements of the Uniform Federal Crime Reporting Act of 1988; (b) reporting requirements for victim and witness assistance notifications of the Victim's Rights and Restitution Act of 1990, and (c) reporting requirements of the Brady Handgun Violence Prevention Act.

2.14    To that end, Department of Defense Directive 7730.47 and Department of Defense Manual 7730.47-M implement federal criminal-incident reporting requirements. The Department of Defense created the Defense Incident-Based Reporting System (DIBRS) as a central repository of incident-based data. This central repository includes incidents of domestic violence and criminal incident data. The Department of Defense has a non-delegable duty to

monitor and ensure compliance with Directive 7730.47 and populate data from DIRBS to the FBI's National Incident-Based Reporting System (NIBRS). The DIBRS is the tool the Department of Defense uses to collect and transmit reportable criminal incidents to the FBI's Uniform Crime Report Program. The FBI's NIBRS is used in background searches to determine whether an individual is eligible to purchase a firearm.

2.15    Department of Defense Instruction Manual 7730.47 implements the reporting requirements of numerous federal laws, including the Uniform Federal Crime Reporting Act of 1988, The Victims' Rights and Restitution Act of 1990, The Brady Handgun Violence Prevention Act, The Lautenberg Amendment to the Gun Control Act, and The Jacob Wetterling, Megan Nicole Kanka, and Pam Lychner Sex Offender Registration and Notification Program. This instruction manual mandates that Department of Defense agencies, including the Air Force, report criminal incident data to the FBI, maintain a 4 percent or less data submission error rate, and correct errors within 30 days of notification of the error. Department of Defense Manual 7730.47-M Volume 1 implements the policy of Manual 7730-47 and prescribes reporting requirements pursuant to the various federal laws.

2.16    Department of Defense Manual 7730.47-M Volume 1, Enclosure 3, prescribes the reporting data elements needed to comply with Federal criminal incident reporting pursuant to federal law. Enclosure 3 states the Defense Incident-Based Reporting System:

Shall be used to centralize the collection of information that is reportable by the DoD Components pursuant to The Brady Handgun Violence Prevention Act of 1993, which requires the Department of Defense to report these eight categories to the FBI for purposes of prohibiting firearm purchases:

Persons who have been convicted in any court of a crime punishable by imprisonment for a term exceeding 1 year....

Persons who have been adjudicated as mental defectives or who have been committed to a mental institution.  Persons convicted in any court of a misdemeanor crime of domestic violence.

2.17   The United States Air Force had the responsibility to  report court-martial convictions of domestic violence, and commitments of active-duty soldiers to inpatient psychiatric or mental healthcare facilities to the Department of Defense's  Incident-Based Reporting System database.

### B.        The Department of Defense and Department of the Air Force have a history of failing to submit reportable incidents to the FBI's National Instant-Background System database.

2.18    The United States Inspector General evaluated the Department of Defense and its agencies, including the Department of the Air Force, process for reporting accurate criminal incident data to the Defense Incident-Based Reporting System. The Inspector General issued his findings in Report Number DOGIG-2015-01r.

2.19    The Inspector General found that the Department of Defense "is not reporting criminal incident data to the Federal Bureau of Investigation (FBI) ... as required by Federal law." As a result, "10 years of DoD criminal incident data have not been provided to the FBI."

2.20    As an example of reporting failure, the Inspector General noted that between August 2012 and January 2013 the Air Force failed to report data to the Defense Incident-Based Reporting System because the employee responsible had left the job and the replacement employee was not trained.

2.21    The Inspector General concluded:

Our evaluation determined DOD has not completed the FBI's requirements for the DIBRS database certification; therefore, DOD does not report criminal incident data to the Attorney

General, through the FBI.

Between approximately 2005 and 2015, the Defense Incident-Based Reporting System database did not populate its data into the FBI's National Incident-Based Reporting System.

2.22    Before 2016, the United States knew or should have known that the failure to report criminal incident data could foreseeably result in mass shootings.  For example, on June 17, 2015, Dylan Roof shot and killed nine people at Emanuel African Methodist Episcopal Church in Charleston, South Carolina. Roof should have been blocked by the background check system from purchasing the gun that he used to kill those victims. Then FBI Director James Comey concluded: "But the bottom line is clear: Dylan Roof should not have been able to legally buy that gun that day." Director Comey promised to have a full review of the matter conducted by the Inspection Division within 30 days.

2.23    In another high-profile mass shooting, on April 16, 2007,   Seung-Hui Cho shot and killed 32 people on the Virginia Tech campus. In 2005, Mr. Cho had been adjudicated by a court to be mentally ill and involuntarily committed to a mental health facility.  However, because Virginia state authorities had not reported Mr. Cho to the FBI, Mr. Cho was able to purchase the firearms used in the shooting.

### III.   DEVIN KELLEY
#### A.    The Air Force knows Devin Kelley's violent history.

3.1    Devin P. Kelley had a long, troublesome history with the United States Air Force. Mr. Kelley entered active duty on January 5, 2010. He was initially assigned to an Intelligence Specialist program but was cut from the program due to poor grades. The United States then transferred him to the 49th Logistics Readiness Squadron at Holloman Air Force Base, New Mexico.

3.2    Between July 2011 and March 2012, the Air Force placed in Mr. Kelley's employment file at

least four letters of counseling and at least five letters of reprimand. Mr. Kelley's conduct included failure to obey direct orders, creating a hostile work environment, making false statements, and insubordination of a superior officer. In at least seven of these letters, Mr. Kelley was warned that his conduct was a criminal act. In at least three of these letters, the Air Force told Mr. Kelley that he had proven that he could not be depended upon. In at least two of these letters, the Air Force noted that Mr. Kelley could not always be trusted and had demonstrated a disregard for the Air Force's core values. In each of these letters, the Air Force warned Mr. Kelley that future misconduct would lead to more severe punishment.

3.3     During Mr. Kelley's service, he was caught trying to sneak firearms on to Holloman Air Force Base. Military officers were advised that Kelley was attempting to carry out death threats made to his commanding officers.

3.4     While serving in the Air Force, Mr. Kelley began dating Tessa K. Kelley and married her shortly thereafter on April 12, 2011. She had a child from a former relationship. In late April of 2011, Tessa Kelley moved into base housing on Holloman Air Force Base. Devin Kelley abused both Ms. Kelley and her minor child on base. Mr. Kelley would push and hit the child, often on the child's head. On at least two occasions, Mr. Kelley hit the child hard enough to cause death or serious bodily injury. On June 8, 2011, Tessa Kelley took her child to Gerald Champion Medical Center in Alamogordo, New Mexico because he was vomiting. The attending pediatrician noticed not only vomiting, but febrile seizure and bruising to the left side of the child's face. A CT scan revealed a fractured clavicle and subdural hemorrhage (bleeding on the brain). After the fact, Devin Kelley admitted to the United States Air Force that he caused these injuries without excuse or justification. Devin Kelley produced a video confessing to his wrongful conduct.

3.5     The NM Children, Youth, and Families Department took the child into their custody.

3.6    Between June 24, 2011, and April 27, 2012, Devin Kelley also physically and emotionally abused Tessa Kelley. He would punch her, choke her, pull her hair, and kick her. Foreshadowing the violence to come, Kelley threatened Tessa Kelley that if she ever told anyone about the abuse, he would "kill [her] and [her] entire family." He told her, "I could just bury you some where here in the desert and nobody would ever find you." On April 23, 2012, while driving to El Paso, TX, Kelley took out his gun and held it against Tessa Kelley's temple and said, "Do you want to die?" Tessa Kelley pushed the gun away and Mr. Kelley placed the gun in his mouth. He told her he would kill her if she told anyone. Further, Tessa Kelley alleged that Devin Kelley sexually assaulted her during the marriage. Devin Kelley admitted these facts to the Air Force in November 2012.

3.7    Devin Kelley abused Tessa Kelley multiple times and admitted this violent conduct to the Air Force. At least once, Air Force security was called to the residence when Devin Kelley choked Tessa Kelley for at least 15-20 seconds. Mr. Kelley admitted to the Air Force that there was no justification or excuse for his violent conduct.

**B.    The Air Force commits Devin Kelley to a mental health facility.**

3.8    As a result of Devin Kelley's work conduct, threats made by Mr. Kelley, and the domestic abuse of his wife and child, the Government ordered Kelley confined to Peak Behavioral Health Services. Peak is a private psychiatric hospital that has special programs for the care of active duty service members. Upon information and belief, the United States has a contractual relationship with Peak to offer inpatient commitment and therapy.

3.9    While receiving inpatient care at Peak, Mr. Kelley made several threats that if he were picked up by Security Forces, he would go for their guns. While at Peak, Devin Kelley tried to obtain firearms and conducted research into body armor. Mr. Kelley was trying to carry out threats

he made against his chain of command. He made these plans to purchase another firearm because his other weapons had been confiscated by the Air Force, its agents, or contractors.

3.10   Devin Kelley escaped Peak Behavioral on June 7, 2012, by jumping a fence with arrangements to purchase a firearm. Before he could, he was caught by Texas authorities the next day.

**C.        The Air Force convicts Devin Kelley of domestic violence, resulting in his incarceration for a crime punishable by more than one year.**

3.11   The Air Force court-martial alleged several charges against Devin Kelley: (a) Mr. Kelley violated UCMJ Art. 86 by fleeing Peak Behavioral Health Services Facility; (b) Mr. Kelley violated UCMJ Art. 128 by causing physical injury to his stepson, including the broken clavicle and subdural hematoma; (c) Mr. Kelley violated UCMJ Art. 128, by holding a gun to Tessa Kelley's temple and asking if she wanted to die; and (d) Mr. Kelley violated UCMJ Art. 134, by threatening to kill Tessa Kelley, members of her family, and members of his squadron.

3.12   The probable cause findings for Mr. Kelley's charges stated:

The evidence presented during the hearing clearly indicates that the minor child was subject to physical abuse. The evidence also indicates that Mrs. Tessa Kelley was assaulted by a weapon being placed against her head and that AIC Kelley had threatened her on other occasions. Finally, the evidence establishes that AIC Kelley left the Peak Behavioral Health Services facility, his place of duty, without authorization.

3.13   On July 10, 2012, the Air Force determined that Devin Kelley should be confined while awaiting trial because "it is foreseeable that [Mr. Kelley] will not appear for trial and/or will engage in serious criminal misconduct." As a basis for this conclusion, the Air Force noted:

The Evidence shows a serious escalation of behavior involving firearms and threats after the physical abuse of a child. Particularly alarming is his decision to try to obtain another firearm

while undergoing inpatient mental health care, conducting research on body armor, and then escaping from the facility late at night without authorization....

Lesser forms of restraint are inadequate to mitigate the flight risk he poses nor would they prevent him from carrying out the threats that he has made against others, especially given the forethought and planning that he  showed by attempting to purchase another firearm and his escape from the mental health facility.

3.14    The Air Force General Court Martial Order No. 10 specifically noted at the top of the order that this was a "Crime of Domestic Violence. 18 U.S.C. § 922(g) (9)." The citation to section 922(g)(9) references the federal law that prevents individuals convicted of even a misdemeanor crime of domestic violence from possessing a firearm.

3.15    Devin Kelley pleaded guilty to unlawfully striking Tessa Kelley, choking her, pulling her hair, and kicking her. He also pleaded guilty to assaulting his stepson with force likely to produce death or grievous bodily harm. His other charges were withdrawn and dismissed with prejudice as a part of his plea deal. The Air Force sentenced Devin Kelley to 12 months of imprisonment, a bad-conduct discharge, and reduction in rank to airman basic (E-1). During Mr. Kelley's pre-trial and post-trial confinement, the Air Force placed him on lockdown for suicide risk. On April 10, 2014, the Air Force discharged Devin Kelley.

**D.**    **The Air Force failed to report Devin Kelley's domestic violence conviction, his incarceration for a crime punishable by more than one year, and his commitment to psychiatric inpatient care.**

3.16    Under federal law and Dep't of Defense Manual 7730.47-M, Vol. 1, Enclosure 3, the United States Air Force (and its agents and employees) had a mandatory, non-delegable

obligation to report Devin Kelley's indictments, convictions at court-martial, commitment to a mental institution, and domestic violence to the FBI.

3.17    And the Department of Defense failed to ensure that its own directives were properly enforced. The Air Force had an unacceptably high failure rate of which the Department of Defense was aware. The Department of Defense's failure to manage, supervise, and monitor the Air Force's repeated failures to comply also proximately caused Mr. Kelley's conduct and conviction to go unreported.

3.18    In 2014, the Inspector General of the Department of Defense evaluated the reporting system's compliance with its own mandatory procedures and policies. The principal finding of this investigation condemned the performance of the Department of Defense. Specifically, it found that the military was:

not reporting criminal incident data to the Federal Bureau of Investigation (FBI) for inclusion in the annual Uniform Crime Reports to the President, the Congress, State governments, and officials of localities and institutions participating in the Uniform Crime Report Program, as required by Federal law.

3.19    As a result of this failure:

10 years of DoD criminal incident data have not been provided to the FBI for inclusion in the annual uniform crime reports to the President, the Congress, State governments, and officials of localities and institutions participating in the UCR Program, as implemented in DoD Directive 7730.47 and DoD Manual 7730.47-M, Volume 1.

**E.**                **The Air Force failed to submit Devin Kelley's fingerprint data and conviction to the FBI's criminal background check database.**

3.20    The FBI's Next Generation Identification database's primary function is to provide the FBI a fully automated fingerprint identification and criminal history reporting system. The failure to

populate this database with all the required fingerprint records can allow someone to purchase a weapon who should not, hinder criminal investigations, and potentially impact law enforcement and national security interests.

3.21    Specifically, among other uses, the Next Generation Identification information is checked by Federal Firearms Licensees to instantly determine, through the FBI's National Instant Criminal Background Search System, whether a prospective buyer is eligible to buy firearms. The failure to populate FBI databases with all the required fingerprint records can result in someone purchasing a weapon who should not.

3.22    The United States' Inspector General admitted the allegations in Paragraphs 3.20 and 3.21 in Report No. DOGIG-2018-035, dated December 4, 2017. The Inspector General found that the Military Services did not consistently submit fingerprint cards and final disposition reports as required. The Inspector General stated:

Any missing fingerprint card and final disposition report can have serious, even tragic consequences, as may have occurred in the recent church shooting in Texas.

3.23    The Air Force criminal fingerprints are submitted to the FBI either electronically or by mail. In the time period sampled by the United States Inspector General, he found that the Air Force Security Forces failed to submit fingerprint cards and final disposition reports the majority of the time-in sixty (60) percent of cases.

3.24    In 2015, The Inspector General made recommendations to the Department of the Air Force to correct errors in the submission of fingerprint cards and final disposition reports in Report No. DOGIG-2015-081. The Air Force agreed with this recommendation. However, the Air Force took no corrective action to ensure Devin Kelley's finger prints or final criminal disposition reports were reported. And the Department of Defense did not follow its policy to monitor compliance with these reporting requirements.

### IV. CAUSES OF ACTION

#### A.      The Department of the Air Force was negligent.

4.1    The Department of the Air Force negligently failed to report criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution.

4.2    The Department of the Air Force failed to submit criminal-history data to the FBI when probable cause existed in the Air Force Office of Special Investigations and Air Force Security Forces investigations on Kelley, after Kelley's court-martial convictions, and also upon his post-trial confinement at Holloman Air Force Base.

4.3    The United States, through Secretary of the Air Force Heather Wilson, admitted the allegations found in Paragraph 4.2 in response to a question by Senator Mazie K. Hirono in a submission dated December 13, 2017.

4.4    Alternatively, the Department of the Air Force negligently submitted inaccurate or incomplete criminal incident data to the Defense Incident-Based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

4.5    The Department of the Air Force negligently failed to correct incomplete or incorrectly submitted criminal-incident data to the Defense Incident-based Reporting System of Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, or commitment to the mental institution.

4.6    The Department of the Air Force negligently failed to submit fingerprint cards and final disposition reports for Devin Kelley's criminal convictions, or alternatively submitted incomplete or incorrect data to the FBI as required by federal law. As a result, the FBI's Next Generation

Identification database lacked critical information about Devin Kelley's history and failed to prevent the sale of firearms to Devin Kelley.

4.7     Preliminary findings by the Air Force Inspector General confirmed the Air Force Office of Special Investigations and Security Forces personnel then assigned at Holloman Air Force Base, New Mexico, did not report required information to civilian law enforcement in the Kelley case. The review also found the error in the Kelley case was not an isolated incident and similar reporting lapses occurred at other locations.

4.8     In fact, the problem was widespread across both the Office of Special Investigations and the Air Force Security Forces. A 2015 Defense Department audit revealed that the Air Force was not in compliance with a mandatory statutory requirement to report all offender criminal history data and, despite the discovery of non-compliance, the Air Force made no retroactive corrections.

4.9     The Department of the Air Force admitted the allegations contained in Paragraph in a press release published on November 28, 2017. The Department of the Air Force, through the Secretary of the Air Force Heather Wilson, admitted the allegations contained in Paragraph 4.8 on December 6, 2017 before the United States Senate Judiciary Committee.

**B.      The Department of Defense was negligent.**

4.10    The Department of Defense negligently failed to ensure that the Department of the Air Force submitted the required criminal incident, fingerprint cards, and final disposition data.

4.11    The Department of Defense negligently failed to ensure that identified criminal incident data errors are tracked to correction.

4.12    The Department of Defense negligently failed to populate data about Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution from the Defense Incident-Based Reporting System into the FBI's National Incident-Based System.

C.      **The United States through both the Department of Defense and the United States Air Force was Negligent Per Se Under Applicable Texas Law**

4.13    Numerous Texas courts have already recognized the viability of a tort action based on violations of Section 922 of the Brady Act. See Reyna v. Academy Ltd., No. 01-15-00988-CV, 2017 WL 3483217, at *4–7 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, no pet. h.) (recognizing violation of § 922 may constitute negligence per se); Wal-Mart v.Tamez, 960 S.W.2d 125, 128 (Tex. App.—Corpus Christi 1998, pet. denied) (same); Bryant v. Winn-Dixie Stores, Inc., 786 S.W.2d 547, 548–550 (Tex. App.—Fort Worth 1990, writ denied) (same); Peek v. Oshman's Sporting Goods, Inc., 768 S.W.2d 841, 844 (Tex. App.—San Antonio 1989, writ denied) (same); Ellsworth v. Bishop Jewelry and Loan Co., 742 S.W.2d 533 (Tex. App.—Dallas 1987, writ denied) (same). Texas law therefore recognizes a tort action that is analogous to the action that Plaintiffs are bringing under the FTCA.  Vice-principals of the United States Air Force and the United States Department of Defense failed to perform their statutorily required duties Under Section 922 and the other aforementioned statutes and regulations. Texas does not and would not allow private persons to act with the astonishing level of impunity audaciously suggested by the United States in prior motions in companion cases arising out of the same shooting, when their negligent acts and omissions result in the murders and grievous injuries of Texas citizens as a result of such brazenly negligent conduct as the facts of this case demonstrate.

D.      **Under Texas law, the United States is directly liable to the Plaintiffs through its Vice- Principals**

4.14    Plaintiffs incorporate the preceding paragraphs and re-allege them as if fully set forth here. Texas law imputes direct liability for the acts and omissions of vice-principals that proximately cause injury and damages. Persons with command authority over units and

19

divisions of the Air Force, and/or over the entire Air Force and Department of Defense; and/or who had authority to employ, direct and discharge Air Force personnel and/or were responsible for engaging in non-delegable duties imposed on the Air Force by law and regulations committed the acts and omissions that directly and proximately caused the injuries and damages of each plaintiff. Their acts are deemed under Texas law as the acts of the Air Force and the Department of Defense itself.

4.15   Vice-principals of the United States Air Force breached their statutory duties to enforce their non-delegable mandatory obligations under 18 U.S.C. 922(d) (l) to cause the relevant personnel within the Air Force to report persons who have been indicted or convicted in any court of a crime punishable by imprisonment for a term exceeding one year, specifically including airman Devin Kelley.

4.16   Vice-principals of the United States Air Force breached their statutory duties to enforce their non-delegable mandatory obligations under 18 U.S.C. 922(d)(4) to cause the relevant personnel within the Air Force to report persons who have been committed to a mental institution, specifically including airman Devin Kelley.

4.17   Vice-principals of the United States Air Force breached their statutory duties to perform their non-delegable mandatory obligations under 18 U.S.C. 922(d)(l) to cause the relevant personnel within the Air Force to report persons who have been indicted or convicted in any court of a crime of domestic violence. 18 U.S.C. 922(d)(8).

4.18   Vice-principals of the United States Air Force breached their legal obligation under Department of Defense Instruction 6400.06, which states in pertinent part: "[I]t is DOD policy that a 'qualifying conviction' also includes a conviction for a 'crime of domestic violence' tried by general or special court-martial which otherwise meets the definition of domestic violence." *Id.* at section 6.1.4.3. Further, a "conviction for an offense meeting the definition of a 'felony

20

crime of domestic violence'.......shall also be considered a qualifying conviction." *Id.* at section 6.1.4.3.1.

4.19    Devin Kelley's conviction met the Requirements of DOD Instruction 6400.06 and other applicable sections of 18 U.S.C. 922(d) yet Command level Air Force and Department of Defense personnel (i.e., Vice-principals under Texas law) negligently failed to cause the relevant information to be input into the relevant database by those acting under their control or direction in their squadron.

4.20    The pre-trial confinement order, entered on June 8, 2012, and signed by Commander of the 49th Logistics Readiness Squadron, Commander Nathan McCleod-Hughes, determined, "The course of conduct by AlC Kelley leads me to conclude that he will continue to engage in serious criminal conduct if not confined. He pointed a gun at his wife and then himself; carried a weapon openly on his person; confessed to injuring his stepchild, and then fled the area by driving to San Antonio, TX." The Order further concluded: "But for the intervention by his father, I'm convinced that he would have been AWOL and would not have returned on his own accord to Holloman AFB. After learning that he might be released from the mental health facility, he deliberately planned to obtain another gun (the other gun having been taken away from him) and body armor after making threats to kill his wife and threats to try to take away the guns of any security forces members." The Order summarized the findings as follows: "I am convinced that he is dangerous and likely to harm someone if released. I further believe that he is a flight risk. He fled to San Antonio, TX after turning over his confession to harming his stepchild, thus demonstrating that he is not likely to be present at any further hearings regarding his case.  Furthermore, when he was informed that he might be released from the mental health facility and placed into pretrial confinement or other restrictions, he escaped from the mental health facility by jumping a fence late at night after making arrangements to purchase a handgun." Command Level Air Force Personnel

concluded that Devin Kelley was dangerous and likely to harm someone if released.

4.21    Commander McCleod-Hughes unquestionably functioned as a squadron leader in charge of the command of an entire squadron of the Air Force, and his authority renders him a vice-principal under applicable Texas law.   McCleod-Hughes negligently failed to cause his subordinates in the 49th Logistical Squadron and the investigative personnel assigned thereto to report the relevant disqualifying information to the FBI regarding the Devin Kelley. His negligence in failing under his command authority to do so is negligence of the United States itself.

4.22    Air Force and Department of Defense vice-principals violated DoD Directive 5106.1 (references (b) and (c)) that all DCIOs and all other DoD investigative and police organizations shall submit to the FBI as prescribed therein, the offender criminal history data for all Armed Forces members they investigate for the commission of an offense listed in enclosure 3.   Indeed, Commander McCleod Hughes, as the Squadron Commander failed as a vice-principal to ensure that persons under his command and control submitted the statutorily required information into the FBI's background check system.  His failure to do so and instruct those under his command to do violated not only Air Force and DoD regulations, but also the express requirement of Section 922 of the Brady Act.   At no time during the pre-trial confinement or the court-martial proceedings did Commander McLeod Hughes perform his statutory duties as a vice-principal of the Air Force and the squadron leader of this disturbed airman to ensure that the information necessary for civilian authorities to become aware of the danger posed by Airman Kelley was submitted as required by law to the FBI.

4.23    Further, DODI 5055.11 PS, Section 5.1 mandates that the Inspector General of the Department of Defense shall monitor and evaluate compliance with this instruction. Under section 5.2, the Secretaries of the Military Departments and the Heads of the other DoD

Components shall: (5.2.1) issue procedures as may be necessary to implement and comply with this instruction; (5.2.2) ensure that Commanders (i.e. vice-principals) establish and follow procedures to promptly notify the appropriate DCIO or other DoD law enforcement organization when a military judicial proceeding is initiated or command action is taken in non-judicial proceedings against a military subject investigated by a law enforcement organization for   an offense listed in enclosure 2 and of the final disposition of such military judicial or non-judicial proceedings.

4.24   Vice-principals, including but not limited to Commander McLeod Hughes,   of the United States Air Force breached their mandatory  non- delegable duty to report the required information into NICS upon the initiation of the articles of court-martial against Devin Kelley in September 2012,  and upon his conviction, and upon his sentencing.  On December 6, 2017, Secretary Dr. Heather Wilson of the United States Air Force admitted under oath before the Senate Judiciary Committee that the United States Air Force should have input the required information on the occurrence of each of those events.

4.25   Under 18 U.S.C. § 922(d) and Department of Defense Manual 7730.47-M, Vol. 1, Enclosure 3, the United States Air Force had a mandatory obligation to report Kelley's indictments, convictions at court-martial, commitment to a mental institution, and domestic violence to the FBI. However, vice-principals of the Air Force and Department of Defense failed to report Kelley's legally required and disqualifying data into the NICS as obligated by law. Vice-principals at the Department of Defense failed to ensure that its own mandatory directives were properly enforced as its agency, the Air Force, had an unacceptably high failure rate of which the Department of Defense was aware. The Department of Defense's failure, by vice-principals in charge of the applicable units and divisions of the Department of Defense and the Air Force, to manage, supervise, and monitor the Air Force's repeated failures to comply with

these mandatory directives also caused Devin Kelley's conduct and conviction to go unreported.

4.26    The vice-principals in the Air Force responsible for mandating compliance with the applicable mandatory, non-discretionary statutes and regulations set forth herein negligently failed to order, monitor, supervise, train and enforce the mandatory requirements of these laws and regulations by all relevant personnel in all relevant units and divisions of the Air Force.

4.27    Secretary Wilson testified before the Judiciary Committee in December 2017 that the Air Force Inspector General and the Air Force would monitor corrective action and complete periodic audits, prospectively, to insure compliance with the required regulations and statutes for reporting criminal history information to the FBI.   The Inspector General and the Auditor General of the Air Force occupy positions as vice-principals of the Air Force within the meaning of Texas law and failed to perform their required obligations to order, audit the completion of and compel the input of the statutorily required information in a timely manner. Their failures to comply with their statutory duties as vice principals of the Air Force prevented the FBI from receiving the statutorily necessary information from relevant personnel in the Air Force to prevent this disqualified, sick airman from ever passing a background check using the NICS database once the Air Force turned him loose on civilian society with no notice whatsoever of the danger following the completion of his sentence.

4.28    Secretary Heather Wilson and her predecessor, as Secretaries of the Air Force, had the obligation to monitor DoD IG audit reports and Air Force Auditor General reports, directly and through their direct subordinates, to ascertain compliance with the United States Code and DoD regulations and directives promulgated to comply with the United States Code, including but not limited to 18 U.S.C. § 922(d) and Department of Defense Manual 7730.47-M, Vol. 1, Enclosure 3.  The DOD IG's Report 2019-30 "Report of Investigation into the United States Air Force's Failure to Submit Devin Kelley's Criminal History Information to the Federal Bureau

of Investigation" expressly sets forth the failures of the Air Force, the Air Force Security Service and the Air Force Office of Special Investigations (AFOISI) to comply with the statutory reporting requirements to the FBI for years prior to its first audit report in 1997.  It notes that Report PO 97-003 found a high level of non-compliance years preceding the release of that report. (P.55). The Air Force agreed with the DoD IG's recommendations to develop new interim procedures and issued a directive by AFOSI in December 1996 "which emphasized that reporting requirements are a mandatory inspection item for all AFOSI self-inspections and AFOSI Inspector General inspections."

4.29   Report 2019-30 goes on to document that in 2015 the DoD IG issued Report No. DoDIG-2015-081, which   "determined that the Military Services still did not consistently submit fingerprint cards and final disposition reports as required." (P 56).   The failures included failing to report twenty-eight percent of the required fingerprint cards and thirty percent of the final disposition reports to the FBI", yet neither the present nor former Secretary of the Air Force, using their authority as vice-principals of the Air Force, took the necessary and agreed steps to make the necessary corrections to eliminate the reporting deficiencies retroactive prior to the shooting at the First Baptist Church on November 5, 2017.

4.30   The DOD IG report 2019-30 further noted that in November of 2017 the same office was conducting yet another review of compliance by the military service branches with the Brady and related DoD mandatory obligations (p. 56)  and issued on December 5, 2017, Report No. DODIG-2018-035, "Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations".   Report 2019-30 further notes that the 2017 report found that the Air Force continued to fail to report fourteen percent of the required fingerprint cards and an identical percentage of the final disposition reports to the FBI as required by law.

4.31   The Air Force Chief of Staff,   the Air Force Deputy Chief of Staff for Logistics, Engineering and Force Protection and their respective predecessors each negligently failed as vice-principals to issue timely and necessary orders to comply with the statutory obligations to report the fingerprint cards and final disposition reports of all disqualified airman. they further failed to issue timely orders on receipt of the DOD IG audit report in February 2015 and at all time thereafter prior to the shooting in the First Baptist Church to correct training and compliance deficiencies by issuing the necessary and "more robust"  training requirements  to which Secretary Heather Wilson attested under oath on December 13, 2017 in response to Question for the Record 1 issued by  Senator Mazie Hirono following Secretary Wilson's live testimony before the  United States Senate Judiciary Committee on December 6, 2017.

4.32   The Secretary of the Air Force and her predecessor Secretary Deborah Lee James failed as vice-principals of the Air Force to comprehend  and address the size, scope and severity of the continued violations of the Brady Act and DoD mandatory policies outlined herein to order the relevant subordinate offices within their respective commands to in turn order the responsible personnel at the AFOSA and Air Force Security Commands  to timely report all disqualifying information under NICS to the FBI and to retroactively  make the corrective changes to report the unreported disqualifying information, to which the Air Force agreed as Secretary Wilson admitted under oath following issuance of  DoD IG report number  DoD IG-2015-081, issued in February 2015.

4.33   Indeed,   certain vice-principals and their predecessors in positions throughout the command structure of the Air Force held command authority, on information and belief from the Air Force's own published listing of commands in 2016,   that empowered and authorized them to act by commanding many subordinates under their command,  yet failed to act within the scope of their respective areas of command responsibility to order, compel and otherwise

ensure that fingerprint cards, disposition reports and other disqualifying information mandatorily required to be reported to the FBI were in fact timely reported in accordance with Sections 922 of the Brady Act and the other relevant statutes, directives and regulations set forth herein. (See attached as <u>Exhibit A</u>  Air Force Magazine, September 2016 edition p. 72-79). Those vice-principals include, but are/were not limited to General David Goldfein, Air Force Chief of Staff;   General Stephen W. Wilson, Air Force Vice Chief of Staff;  Lt. General Gina M. Grosso, Deputy Chief of Staff in Manpower, Personnel and Services;  Lt.  General John W. Raymond, Deputy Chief of Staff in Operations;    Deputy Chief of Staff in Operations Lt. General John B. Cooper;  and other vice-principals whose identities are known to the United States and will become known to the Plaintiffs through the discovery process.

4.34   All of the aforementioned vice-principals were negligent in directing and commanding the  operational tasks mandated  under the applicable statutes, directives and regulations to mandatorily report the disqualifying information of the shooter to the FBI long before this shooter left the Air Force  and sought to purchase firearms from  licensed dealers  that were used in the shooting, and which resulted in the permanent injuries to Plaintiff Kris Workman that would not have occurred had the vice principals ordered the  performance of the specific, mandated statutory tasks set out above. The negligent performance of the operational tasks in an affirmative way increased the harm to the public at large, and the victims of the shooting, including specifically, Kris Workman.

4.35   Additionally, national background check systems designed specifically to be accessed to determine whether a particular purchaser's receipt of a firearm violated the Gun Control Act was not properly populated due to the failure to perform the operative tasks in a reasonable way. Information actually known by the Airforce and United States of America through its vice principals demonstrated Devin Kelley's purchase of firearms in the shooting would have, and

should have, been denied.

4.36    Due to the failure to properly perform operative tasks by vice principals and their subordinates, the shooting and killing with the weapons obtained wrongfully occurred. It was more likely true than not true that Kelley would not have shot Kris Workman and other victims at the time of Mr. Workman's severe injuries, without the acquisition and use of the type of firearms Kelley felt he needed to be armed with to perform the task he chose. The failure to adhere to, and operatively perform, the ministerial directives (including in house and external standard operating procedures set out above) resulted in NICS policies that govern investigation and reporting--that were required as ministerial acts and mandated to be complied with--not to be properly followed. The very acts that would have given rise to a "denied" response to any inquiry into the required data bases to be searched were not listed, as a direct result of the operational tasks not being performed in a reasonable way.

4.37    Individually and collectively, vice-principals and other as yet unknown vice- principals- -pending discovery--of the Air Force and DOD negligently failed to comply with non-delegable mandatory duties, thereby subjecting the Air Force to direct liability for its negligent acts that proximately caused permanent injuries to Mr. Workman.

## IV.    CAUSATION

**A.    Department of Defense and Department of the Air Force's negligence caused the injuries and damages to the  Plaintiff Kris Workman.**

5.1    One or more of the above negligent acts of the Department of the Air Force and the Department of the Defense directly and proximately caused injury to the Plaintiffs.

5.2    When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI Incident-Based Reporting System should have included Devin Kelley's criminal conviction of a crime punishable by imprisonment for a term exceeding one year, convictions of domestic violence, and commitment to the mental institution. The FBI's database

did not contain any of this required information, or alternatively, contained incorrect or incomplete information, as a direct and proximate result of one or more of negligent acts of the Department of Defense and Department of the Air Force.

5.3    When Devin Kelley attempted to purchase firearms to use in the Sutherland Springs shooting, the FBI's National Instant Criminal Background Search System should have contained Devin Kelley's criminal history, populated from the FBI's Next Generation Identification system. However, because of the Government's negligence and utter failure to comply with mandatory non-delegable duties, Kelley's fingerprint identification and criminal disposition reports were not submitted to the FBI and the FBI's Background Check System did not contain Kelley's convictions. When Devin Kelley attempted to purchase the firearms used in the Sutherland Springs shooting, the sale should have been blocked for one or more of the following reasons:  (a) he had a conviction of a crime punishable by imprisonment for a term exceeding one year; (b) he had a conviction for domestic violence; and (c) he had previously been committed to a mental institution.

5.4    When Devin Kelley purchased the firearms used in the Sutherland Springs shooting, his omission from the FBI's background check system and ability to complete the purchase was a direct, proximate, and foreseeable result of one or more acts of negligence of the Department of Defense and Department of the Air Force.

**B.        Had the Air Force reported Kelley's history, the FBI's Instant Criminal Background Check System would have blocked Devin Kelley's firearm purchase.**

5.5    Devin Kelley purchased the firearms used in the Sutherland Springs shooting in April 2016 from a federal firearms licensee, Academy Sports & Outdoor. At the time,    the licensee must submit biographical information about Kelley to the FBI's Instant Criminal Background Check System. If the Air Force had properly reported Devin Kelley's history to the FBI as it was required

to do, the Background Check System would have informed the firearms dealer to deny the purchase.

5.6     The purpose of the Uniform Federal Crime Reporting Act of 1988, the Brady Handgun Violence Prevention Act, and the Domestic Violence Offender Gun Ban are to ensure that violent offenders and high-risk individuals like Mr. Kelley do not get access to firearms. The Department of Defense in 1994 began designing the Defense Incident-Based Reporting System (DIBRS) to meet criminal justice related reporting requirements mandated by the Uniform Federal Crime Reporting Act and the Brady Handgun Violence Prevention Act. The DIBRS permits the DOD to forward offense and arrest information required by FBI.

5.7     The entry into the federal law-enforcement database would have blocked Mr. Kelley's purchase of the firearms used in the Sutherland Springs' shooting. The Government's acts or omissions directly and proximately resulted in Devin Kelley's purchase of the firearms used in the November 5, 2017 Sutherland Springs First Baptist Church shooting.

VI.   DAMAGES

6.1     The preceding paragraphs are incorporated and re-alleged as if fully set forth herein.

6.2     Plaintiff seeks recover for all elements of damages to which he is entitled under Texas law. Plaintiff has incurred substantial past medical expense which are ongoing and is expected to incur future medical expense in excess of one million five hundred thousand dollars during the duration of his lifetime.

6.3     Plaintiff further seeks damages for physical pain and mental anguish, including mental torment, pain and suffering, physical impairment, as well as significant disfigurement resulting from gunshot wounds throughout his body.

6.4     As a direct and proximate result of the negligent, careless, and reckless conduct and failures of Defendant United States of America,  Plaintiff Kris Workman was injured and seeks compensatory damages under applicable Texas law and statutory law of the United States.

30

## VII.  JURISDICTION, VENUE, & SERVICE

7.1     This Federal District Court has federal-question jurisdiction of this action because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671-2680, commonly known as the Federal Tort Claims Act.

7.2     Venue is proper in this district pursuant to 28 U.S.C. § 3191(e)(l) because the United States is a Defendant, Plaintiffs reside in the Western District, and no real property is involved in the action.

7.3     The United States of America may be served with process in accordance with Rule 4(1) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint by certified mail, return receipt requested, to the  following:


        John F. Bash, Esq.
        United States Attorney for the Western District of Texas United States
        Attorney's Office
        ATTN: Civil Process Clerk 601 NW Loop 410, Suite 600 San Antonio, Texas
        78216

        William Barr
        Attorney General of the United States, The Attorney General's Office
        ATIN: Civil Process Clerk
        950 Pennsylvania Avenue, NW Washington, DC 20530-0001

## VIII.  LIABILITY OF THE UNITED STATES

8.1     This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671-80,  the Federal Tort Claims  Act. Liability of  the United States is predicated specifically on 28 U.S.C. § 2674 because the  personal  injuries and resulting damages of which the complaint is made were proximately caused by the negligence, wrongful acts or omissions of employees or agents of the United States of America working for the United States Department of the Air Force  and/or  Department  of Defense, while acting

within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

8.2     The United States Department of Defense and Department of the Air Force are agencies of the United States. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated Holloman Air Force Base and staffed its facilities and vehicles with its agents, servants and employees. The Defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Defense Manpower Data Center, which operates the Defense Incident-Based Reporting System.

8.3     This lawsuit is not a claim listed in 28 U.S.C. § 2680, exceptions to the Federal Tort Claims Act.

## IX. JURISDICTIONAL ALLEGATIONS

9.1     Pursuant to 28 U.S.C. § 2675(a), Plaintiff timely presented his claim to the United States by submitting a Form SF-95 to Mr. Bradford Hunt, located at the U.S. Air Force Claims & Tort Litigation Division, 1500 West Perimeter Road #1700, Joint Base Andrews, Maryland 20762, on July 17, 2018. See attached SF-95. Exhibit B.

9.2     Receipt of the claim (Air Force Claim No. 18-017041) by the Department of the Air Force on June 20, 2018 was acknowledged by Jennifer Freda, paralegal to General Torts Branch, Air Force Claims and Tort Litigation Division. *(See* Ms Freda's correspondence acknowledging receipt of claim attached as Exhibit C.)

9.3     As of May 9, 2019, more than six months have elapsed since the claim was presented to the Defendant United States of America and Defendant United States of

America has not made a final disposition of Plaintiffs' claims. Accordingly, the claims of the Plaintiff is deemed denied pursuant to 28 U.S.C. § 2675(a).

9.4     Plaintiff has exhausted his administrative remedies under the Federal Tort Claims Act and has fully complied with all jurisdictional and statutory prerequisites and conditions precedent to the commencement and prosecution of this lawsuit against the Defendant United States of America.

9.5     Plaintiffs claimed $31,000,000 in damages in his administrative claim and seeks damages in such amount here.

## CONCLUSION

Plaintiffs request that Defendant be cited to appear and answer this Complaint; that upon final trial, the Plaintiffs have judgment against Defendant, for the amount of actual damages and for other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other relief, at law and in equity, both general and special, to which Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully submitted,

_____/s/ Brett Reynolds_____
BRETT T. REYNOLDS
Federal Bar No. 19994
State Bar No. 16795500
btreynolds@btrlaw.com
BRETT REYNOLDS & ASSOCIATES, P.C.
1250 NE Loop 410, Suite 310
San Antonio, Texas  78209
(210) 805-9799 – Telephone
(210) 455-2434 – Facsimile
**ATTORNEY FOR PLAINTIFF**